UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Huff, Judges Alston and AtLee
Argued by teleconference

TONYA J. COGAR, S/K/A
 TONYA LOPEZ COGAR

v.       Record No. 0673-17-3

MEMORANDUM OPINION* BY
JUDGE RICHARD Y. ATLEE, JR.
DECEMBER 27, 2017

SHENANDOAH VALLEY DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Victor V. Ludwig, Judge

Shelly R. James (John Elledge & Associates, on brief), for
appellant.

James B. Glick; Eric D. Swortzel, Guardian *ad litem* for the minor
children (Vellines, Glick & Whitesell, P.C., on brief), for appellee.

Tonya J. Cogar appeals a decision of the Circuit Court of Augusta County terminating

her parental rights to two of her children. We affirm.

I. BACKGROUND

The facts and legal proceedings in this case unfolded over the course of approximately

two years. In April 2015, the Shenandoah Valley Department of Social Services ("DSS")

removed two children from Tonya J. Cogar ("mother"): her daughter "A." (born in 2010) and

her son "M." (born in 2013). In April 2016, the Juvenile and Domestic Relations District Court

of Augusta County ("the J&DR court") terminated mother's parental rights to those children.

Mother appealed that decision to the Circuit Court of Augusta County ("the circuit court"),

which terminated her parental rights in April 2017. Mother now appeals that decision.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

We view the evidence in the light most favorable to the party that prevailed below, and draw all reasonable inferences from the evidence in that party's favor. Boatright v. Wise Cty. Dep't of Soc. Servs., 64 Va. App. 71, 76, 764 S.E.2d 724, 727 (2014). Here, DSS prevailed in the circuit court. The facts were as follows.[1]

DSS removed the children in April 2015. The circuit court summarized the issues precipitating that removal:

> [T]he reason for the removal was that Cogar had taken the children to Augusta Health with "concerns that [they had been] 'injected with GPS tracking devices,' and that they were 'left with a pedophile and the Mexican Cartel.'" In addition, Cogar "apparently expressed concerns . . . that [the children] had been 'injected with needles that were still in their legs, and the children [had] microchips implanted in them.'" Cogar reported that the children's father had "wired the house" and that he was "directing water toward the flooring within the home so as to soften the flooring and cause an explosion . . . with the electrical wiring beneath the residence."

(Citations omitted) (quoting psychological evaluation (all but first alteration in original) (referring to mother as "Cogar") (quoting foster care service plan)). Mother reported to the evaluating psychologist previous diagnoses of attention deficit disorder and bipolar disorder. She also confirmed that, near the time the children were removed, Augusta Health diagnosed her as "delusional."

Unable to locate a relative with whom to place the children, DSS placed them in a foster home. The foster care service plan developed by DSS, and approved by the J&DR court, included requirements that mother attend scheduled visitations with the children, maintain stable housing, maintain stable employment, "report any changes in her whereabouts" and contact information, cooperate with the "Promoting Safe and Stable Families" program, and "attend,

---

[1] Unless otherwise indicated, the quotations that follow are from the circuit court's detailed letter opinion, issued May 8, 2017.

participate in, and successfully complete any services recommended from the [psychological] evaluation." The psychological evaluation recommended "participation in psychiatric treatment as soon as possible," "individual counseling or psychotherapy," and "participation in an intensive parenting education program." The evaluation also observed that mother had "a history of a documented bipolar disorder, yet she has not been taking any mood stabilizing medication recently."

DSS arranged a supervised visitation schedule for mother, but mother was frequently late for visits, and missed several outright. Within six months of the removal of her children, mother quit her job as a nurse's aide and moved to West Virginia. When that occurred, "the weekly [visitation] schedule was reduced to every alternate week, at [mother]'s request." After June 2016, visitation ceased entirely.[2]

DSS often had difficulty finding mother, who lived in multiple locations over a short span of time. She acknowledged failing "to keep [DSS] informed of her physical residence" after moving to West Virginia in 2015. Even her address at the time of trial was unclear:

> [W]hen asked about her current address, [mother] initially responded, with some lack of certainty, that she lived . . . in West Virginia. After the question was asked multiple times, and after [mother] evaded answering it, she testified that she had recently returned to Virginia and finally said, "Well, I am homeless." Pressed further, she said that she was currently staying with "Poppy," whose name, she believes, is "Valentine—maybe." She has been with him for approximately three weeks (she was not certain of the time), at a house somewhere in Stuarts Draft (she could not be more specific), and she did not know the street or post office address. Asked whether she intended to remain in Virginia, her response was that she "would like to—maybe." She testified

---

[2] The visits ceased for what appear to have been several reasons, among them mother's deteriorating relationship with DSS and the absence of any legal requirement that DSS provide mother with visitation, once the J&DR court terminated mother's parental rights in April 2016.

that she is seeking employment and housing, but she offered no
details of her efforts or prospects for success in either endeavor.

(Footnote omitted).

Mother's employment status was similarly unsatisfactory. In July of 2015, she left her job at Shenandoah Nursing Home, where she had worked for two-and-a-half years. She moved that October to West Virginia, remaining there until apparently moving back to Virginia just before the 2017 trial. During her time in West Virginia, she never worked, notwithstanding her testimony that her CNA license remained valid.

Mother did not participate in psychiatric treatment, although she testified that her family doctor prescribed medication that she was taking at the time of the termination proceeding. (The record does not disclose what that medication was.) Mother reported attending some counseling sessions in West Virginia, but DSS could not confirm this because mother provided no contact information for the provider. No evidence was presented that mother completed the "Promoting Safe and Stable Families" program. Mother participated in two sessions of a fifteen-session parenting program, then moved to West Virginia. She testified that she was ineligible for participation in a parenting program in West Virginia.

## II. ANALYSIS

Mother assigns the following error: "The trial court erred in terminating Appellant/Mother's parental rights because the condition that led to the children going into foster care had been remedied and because DSS's behavior in this case was 'good cause' for her failure to maintain a relationship with her children."

### A. Standard of Review

"A trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). That presumption is rooted in a circuit

court's "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. at 328, 387 S.E.2d at 795. A circuit court's decision "based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988).

## B. Applicable Statute

The circuit court found that termination of mother's parental rights was in the best interests of the children, and terminated those rights pursuant to Code § 16.1-283(C)(1) and (C)(2). A court may terminate parental rights under subsection (C)(1) if it finds, by clear and convincing evidence, that:

> The parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship.

A court may terminate parental rights under subsection (C)(2) if it finds, by clear and convincing evidence, that:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

The subsections provide different mechanisms and justifications for termination. Subsection (C)(1) addresses a parent's failure to maintain contact with a child or to plan for that child's future; subsection (C)(2) addresses a parent's failure to remedy the conditions that caused a child to enter foster care, or required the continuation of the child's stay in foster care. "[E]ach subsection, although similar in nature, is written as a distinct and grammatically independent

- 5 -

provision of the statute" and the different subsections "set forth individual bases upon which a petitioner may seek to terminate residual parental rights." City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 563, 580 S.E.2d 463, 466 (2003). Thus here, although the circuit court made findings that termination was supported under both subsections, a finding as to either subsection alone would have justified termination. For the reasons we outline below, we find that termination was justified under subsection (C)(2). In light of that finding, we need not address whether termination was justified under subsection (C)(1).

### C. Preservation of Error

To begin, we address DSS's argument that mother failed to preserve the errors she now alleges on appeal and that this failure violates Rule 5A:18 and requires dismissal of her appeal. See Rule 5A:18 (stating, in part, that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling"). Mother filed no transcripts in this case. Rather, she filed in the circuit court a copy of the circuit court's letter opinion, designating it as her "Statement of Facts." She included with this pleading a two-page document containing a summary of the arguments she had made at trial. She directs our attention to these two pages as the location of the preservation of her assigned error.

The problem with this pleading is that it was filed outside the deadline contained in Rule 5A:8. Pursuant to Rule 5A:8(c), "[a] written statement of facts, testimony, and other incidents of the case becomes a part of the record when: (1) within 55 days after entry of judgment a copy of such statement is filed in the office of the clerk of the trial court." The circuit court entered termination orders on April 10, 2017. Fifty-five days from that date would be June 4, 2017. That being a Sunday, the copy of mother's written statement of facts was due to be filed on or before Monday, June 5, 2017. Although the certificate mother included when she filed the

statement of facts indicates that the pleading was filed June 5, 2017, the circuit court's clerk's office stamp, and handwritten details written onto that stamp, show that it was actually filed in the clerk's office on June 9, 2017. Because this filing comes outside the 55-day deadline, we cannot consider the two-page recitation of mother's arguments or the attached copy of the letter opinion.

However, the circuit court's letter opinion is included elsewhere in the record. For that reason, we can and do consider the letter opinion, and we treat it as a statement of facts for purposes of this appeal. Rule 5A:18's contemporaneous objection requirement serves "to inform the trial judge of the action complained of in order to give the judge the opportunity to consider the issue and to take timely corrective action, if warranted, in order to avoid unnecessary appeals, reversals and mistrials." Robinson v. Commonwealth, 13 Va. App. 574, 576, 413 S.E.2d 885, 886 (1992). We find that the circuit court's letter opinion clearly addresses the arguments mother now raises on appeal. Thus mother's brief complies with Rule 5A:18, and we consider her arguments on the merits.

### D. Code § 16.1-283(C)(2)

Mother appears to misunderstand both the language of the termination statute, and the circuit court's application of that statute in this case, as evidenced by the following assertion at oral argument:

> [T]he court has to find as a matter of law, based on clear and convincing evidence, that there's been . . . "a failure to remedy the conditions that led to the placement" in foster care. While perhaps it would be easier, and maybe even better, if the statute were worded differently, the statute does not say "the conditions that continue to keep" the children in foster care. The statute plainly says "fail to remedy conditions that led to" the placement.

Oral Argument Audio at 12:57 to 13:38 (Nov. 29, 2017). In fact, Code § 16.1-283(C)(2) says precisely what counsel for mother claims it does not, namely that the termination may not occur

unless it is proven that the "parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to *or required continuation of* the child's foster care placement." (Emphasis added). When this was pointed out to mother's counsel, she responded: "Our position is that, that, that first sentence, first part, 'to remedy substantially the conditions that led to' is what the judge found in this case." Oral Argument Audio at 15:30-15:48 (Nov. 29, 2017). This assertion is belied by the opinion letter of the circuit court, which states: "It is not so much [mother]'s failure to remedy the condition which led to the removal of the children; rather, it is her unwillingness to do the things that were not unreasonably required of her to prevent the continuation of the removal." We agree with this conclusion.[3]

Shortly after DSS removed the children, mother moved out of state. As the circuit court noted:

> Whatever benefit she might have derived from relocating to West Virginia, she acknowledged that the consequences included (a) her leaving her employment, (b) her leaving her residence here, (c) complicating her ability to work with the Department to regain custody of her children, and (d) a significant reduction in the frequency of her visits.

The circuit court went on to observe that mother was "by her own assessment, homeless, or, at best, living with a man whose name she does not know, in a house which she cannot locate, for a period she cannot project; that is hardly an ideal situation."

---

[3] We also observe that mother's assignment of error appears to reference only her preferred portion of subsection (C)(2), by asserting that "the condition that led to the children going into foster care had been remedied." The assignment of error does not address the language in subsection (C)(2) about "the conditions which . . . required continuation of the child's foster care placement." Notwithstanding mother's failure to mention this portion of subsection (C)(2) in her assignment of error, we address it in this opinion, given its centrality in the circuit court's reasoning.

Mother failed to keep DSS adequately informed of her whereabouts, did not obtain adequate psychiatric treatment or psychological counseling, did not complete a parenting program, remained unemployed throughout the majority of the time the case was pending, and was sporadic in her visitation. These failures were of her own making. It is both unfair to the children, and contrary to the controlling statute, that mother be given an indefinite period within which to remedy "the conditions which . . . required continuation of the child[ren]'s foster care placement." Code § 16.1-283(C)(2). Her failure to do so requires affirmance.

III. CONCLUSION

The circuit court's decision to terminate mother's parental rights under Code § 16.1-283(C)(2) was supported by clear and convincing evidence, was in the best interests of the children, and was not plainly wrong.

Affirmed.